People v Angela VV. (2024 NY Slip Op 03851)

People v Angela VV.

2024 NY Slip Op 03851

Decided on July 18, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 18, 2024

CR-23-0712
[*1]The People of the State of New York, Respondent,
v
Angela VV., Appellant.

Calendar Date:June 5, 2024

Before:Pritzker, J.P., Lynch, Ceresia, Fisher and Mackey, JJ.

Mitchell S. Kessler, Cohoes, for appellant.
Elizabeth M. Crawford, District Attorney, Malone (Alyxandra Stanczak of counsel), for respondent.

Ceresia, J.
Appeal from an order of the County Court of Franklin County (Timothy J. Lawliss, J.), entered October 31, 2022, which denied defendant's motion for resentencing pursuant to CPL 440.47, after a hearing.
Defendant was indicted and charged with murder in the second degree and assault in the first degree. The charges stemmed from an incident occurring in November 2013 wherein defendant beat the victim — with whom she had been in an intimate relationship — with a baseball bat and stabbed him with a knife. Following interim proceedings, defendant elected to plead guilty to manslaughter in the first degree and was sentenced in February 2018 to a prison term of 15 years followed by five years of postrelease supervision. In July 2022, defendant applied to be resentenced pursuant to CPL 440.47, seeking to invoke the alternative sentencing provisions of the Domestic Violence Survivors Justice Act (hereinafter DVSJA) (see CPL 440.47; Penal Law § 60.12, as amended by L 2019, ch 31, § 1; L 2019, ch 55, § 1, part WW, § 1). After a hearing, County Court denied defendant's application. This appeal ensued.
The DVSJA, as embodied in Penal Law § 60.12, was amended in 2019 "to provide a more compassionate sentencing scheme for survivors of domestic violence who committed offenses related to that abuse, even where a jury has rejected a justification defense" (People v T.P., 216 AD3d 1469, 1471 [4th Dept 2023] [internal quotation marks omitted]; see generally People v Burns, 207 AD3d 646, 648 [2d Dept 2022]). To that end, the statute "sets forth three factors for a court to consider, namely: (1) whether the defendant was a victim of domestic violence inflicted by a member of the same family or household at the time of the offense; (2) whether the abuse was a significant contributing factor to the defendant's criminal behavior; and (3) whether, having regard for the nature and circumstances of the crime and the history, character, and condition of the defendant, a sentence in accordance with the customary statutory sentencing guidelines would be unduly harsh" (People v Burns, 207 AD3d at 648; see Penal Law § 60.12 [1]; People v Brenda WW., 222 AD3d 1188, 1189 [3d Dept 2023]; People v Fisher, 221 AD3d 1195, 1196 [3d Dept 2023], lv denied ___ NY3d ___ [May 30, 2024]; People v Addimando, 197 AD3d 106, 111 [2d Dept 2021]). A defendant seeking such relief bears the burden of proving by a preponderance of the evidence the facts necessary to support the motion (see People v Addimando, 197 AD3d at 112; see also People v T.P., 216 AD3d at 1471-1472; People v Burns, 207 AD3d at 648).
We preliminarily observe that, in denying defendant's application for resentencing, County Court indicated that it was affording "very little weight" to her hearing testimony, expressly finding that much of it was "incredible, irrelevant, evasive, self-serving, non-responsive, or equivocal." County Court, of course, was in a vastly superior position to make such an assessment, having had the benefit [*2]of observing defendant's testimony firsthand, including her demeanor and the manner in which she answered questions. Recognizing this, and noting that our independent review of the transcript supports many of County Court's characterizations of her testimony, we hereby defer to County Court's credibility determinations as they pertain to defendant. In reaching this conclusion, we would be remiss if we did not additionally acknowledge that defendant has provided ever-changing stories throughout this case, with her more recent versions greatly minimizing her culpability as compared to her earlier versions (see People v Brenda WW., 222 AD3d at 1198-1200 [Pritzker, J., dissenting]). To that point, the fact that defendant has consistently alleged that she was acting in defense of herself when she committed the killing does not demonstrate that her testimony was believable. It is hardly surprising that a person attempting to deflect blame for her own culpable conduct would take such a position. Even more importantly, however, the conduct that defendant confessed to in her statement to the State Police — which will be discussed more fully below — expressly disproves the idea that she was acting in self-defense when she killed the victim, thereby highlighting the fallacy of her self-serving claim. Thus, with defendant's testimony being rejected, it is our view that the remainder of the hearing evidence was insufficient for defendant to satisfy her burden of establishing the requisite second and third factors referenced above, regardless of whether she met her burden on the first factor (see People v Fisher, 221 AD3d at 1197-1198).
Regarding factor two, defendant failed to prove that domestic abuse was a significant contributing factor to her criminal conduct. In an effort to make this showing, defendant relied upon her own testimony — which as just indicated was not credible — as well as the forensic psychological evaluation report authored by clinical psychologist Norman J. Lesswing. This report, however, does not provide the necessary support for this factor. To begin, Lesswing's knowledge of the incident in which defendant killed the victim appears to be based solely upon defendant's self-reporting to him. Even overlooking that, what is truly problematic relative to Lesswing's understanding of the events in issue is that he concludes that the past trauma suffered by defendant has impacted her subsequent memory of and ability to recollect what happened at the time of the killing. Indeed, he states that defendant has "a lack of clarity and reliability in reporting exactly what took place" and has "difficulty with precise, factually based articulation of experiences." Such an opinion is directly belied by the comprehensive statement that defendant gave to a State Police investigator on the day of the killing, which statement Lesswing acknowledges reviewing in his report. In that statement, defendant recalled and explained in a highly detailed fashion and [*3]with an exacting chronology everything that occurred in connection with her killing of the victim. This inherent and inexplicable inconsistency in Lesswing's report, by itself, calls into question the reliability of his opinions.
That said, the most concerning aspect of Lesswing's report and its relation to factor two is the complete absence of any causal nexus between the domestic violence suffered by defendant and her actions in killing the victim. After discussing defendant's history and opining that she is a battered woman, Lesswing turns his attention to the events on the morning of the killing. In so doing, he merely recounts what defendant has self-described to him, including her subjective beliefs. Critically, however, Lesswing never opines or concludes that defendant's prior trauma had any impact on or caused her criminal conduct in this case. This stands in contrast with the forensic report that Lesswing furnished in People v Brenda WW. (222 AD3d at 1191), wherein he described an abusive relationship that led the defendant therein to spontaneously kill the victim. For all of the reasons just discussed, the record lacks credible evidence that the victim's abuse of defendant was a significant contributing factor to her criminal behavior (see People v Fisher, 221 AD3d at 1197).
Moving on, defendant also failed, under factor three, to establish that the prison sentence imposed is unduly harsh in light of the particular circumstances of this case and defendant's history, character and condition. Given the untrustworthy nature of defendant's hearing testimony, a determination of what actually transpired on the morning in question is best gleaned from a reading of the aforementioned written statement that defendant gave to the State Police investigator on the date of the killing. Not only was this statement given when the events were fresh in defendant's mind, but, as previously mentioned, it is replete with intricate details that lend an air of legitimacy to the statement and totally undermine any self-serving claim of blacking out or not recalling what had occurred. Defendant's statement reflects the following.
Defendant awoke at approximately 9:00 a.m. when she heard a sound at the door of the apartment she shared with the victim. She stood up and saw the victim with a knife in his hand. The victim came at her, stating, "I am going to kill you." Defendant pushed the victim, causing him to fall backwards to the floor and drop the knife. Defendant then ran past the victim to the front door but did not think she could open it in time, recalling that there had been problems with the door. Instead, and despite the fact that the victim no longer had the knife, defendant grabbed an aluminum baseball bat, turned back around to face the victim and "went after" him. Defendant then "started attacking" the unarmed victim. The victim defended himself by trying to block and grab the bat. Defendant continued to circle the victim and repeatedly struck him [*4]with the bat in the head, the face, the arms and the hands. Defendant knew that she was connecting because she "could hear it and feel it." Ultimately, defendant hit the victim on the top of the head, causing him to fall to the floor in the corner of the room. From that position, the victim covered his head, telling defendant to stop hitting him. Unmoved, defendant hit the victim in the head three or four more times. Although not set forth in defendant's statement, other hearing evidence established that, as a result of these actions by defendant, the victim sustained a fractured skull and two fractured forearms.
Still with the bat in her hand, defendant noticed the knife on the floor and grabbed it. She turned back around, again approached the victim — who remained on the floor, unarmed, with "blood everywhere" — and stabbed him five or six times in the head, the face, the neck and the chest. After that, defendant took a break by walking over to the computer and sitting down for about five minutes. As she sat there, the victim continued to lie on the floor, "making noises" and not moving.
Even with the victim in this condition and after having taken time to reflect on her actions, defendant chose to move forward with more violence. Realizing that the knife blade had become bent, defendant took efforts to put the blade under her boot and "straighten[ ] it the best [she] could." She then proceeded to walk back over to the victim for the final time and stabbed him twice in his right eye. Defendant waited more than an hour before eventually calling 911 for assistance. Additional hearing evidence revealed that the victim died from multiple stab wounds "that penetrated the protective sac around his heart, pierced the main blood vessel leading to the heart, and sliced into a lung."
In view of this chilling account rendered by defendant in the hours following the crime, which was corroborated by objective evidence of the victim's extensive injuries, it is clear that a reduction of defendant's sentence is not justified. Defendant, who almost immediately faced no imminent threat from the victim, acted in a deliberate and relentless manner in carrying out the brutal killing. Indeed, notwithstanding the fact that the victim was lying on the floor and covered in blood with a fractured skull and two fractured forearms, and despite defendant having paused to think about what she had already done, she resumed her attack. Although we are mindful that the absence of an imminent threat does not necessarily foreclose the proper application of the DVSJA, as the statute may be applied regardless of whether the defendant was entitled to a justification charge (see Penal Law § 60.12 [1]; People v Brenda WW., 222 AD3d at 1192), it is equally true that such an absence may appropriately be considered when assessing whether the particular circumstances of a case render the imposed sentence unduly harsh.
In addition to the circumstances of defendant's criminal conduct, her [*5]history, character and condition weigh against the granting of her motion for resentencing. Evidence in the record establishes that both defendant and the victim abused drugs and alcohol extensively and demonstrates that the domestic violence was not solely one-sided. In that regard, defendant wrote a letter to the victim at one point in their relationship in which she asked him not to fear her and said that she had never hit him on a sober day. Also, in the days leading up to the killing, the victim texted defendant, stating that he did not know how to handle her attacks on him, and defendant responded by apologizing for her behavior. Further, there was testimony and written statements from a man with whom defendant was romantically involved both before and during her relationship with the victim. This man stated that he observed defendant and the victim physically fighting on more than one occasion. He also indicated that defendant had slapped and punched him during the course of their relationship, causing him in one instance to suffer a detached retina. This latter evidence demonstrates that defendant possessed violent tendencies separate and apart from the abuse that she claimed to have suffered from the victim.
The record also supports a finding that defendant has not fully accepted responsibility for her actions. As recently as her testimony during the underlying hearing, defendant refused to acknowledge that she had killed the victim, allowing only that he had "passed away" while she was defending herself. In the face of follow-up questioning, defendant persisted in her refusal to concede that she had killed the victim. Such a refusal to accept even the most basic level of accountability is not only troubling on its own, but it also makes any prior supposed showing of remorse ring hollow at best, and appear feigned at worst.
Defendant's anything-but-admirable behavior while incarcerated sheds additional light on her character and condition. She received numerous disciplinary tickets covering a variety of offensive conduct. In that regard, defendant was ticketed and punished for, among other things, sexual harassment, making fun of an officer's physical appearance, and calling guards names such as "a**hole" and "piece of sh**." She also threw a cup of water at a guard. Defendant's conduct was severe enough that it earned her a 15-day lockdown on one occasion and a 30-day lockdown on another.
Given the foregoing, it cannot be said, upon a fair consideration of the circumstances of defendant's crime as well as her history, character and condition, that the sentence received by her is unduly harsh. Put another way, we do not conclude, as our dissenting colleagues do, that defendant's heinous actions in this case, refusal to accept responsibility for her behavior, history of violence and disturbing record while incarcerated are outweighed by a questionable claim of remorse, a minimal criminal history and the fact that she has the support of [*6]her own family.
In conclusion, we find that this case does not warrant "the compassionate exercise of a sentencing reduction" (People v Brenda WW., 222 AD3d at 1193), which would result in a maximum sentence of between one and five years in prison (see Penal Law § 60.12 [2] [a]). Accordingly, defendant's application for resentencing was properly denied (see generally People v Fisher, 221 AD3d at 1197-1198). Defendant's remaining contentions have been examined and found to be lacking in merit.
Pritzker, J.P. and Mackey, J., concur.
Lynch, J. (dissenting).
We respectfully dissent and would grant defendant's application for compassionate resentencing under the Domestic Violence Survivors Justice Act (hereinafter DVSJA) (see CPL 400.47; Penal Law § 60.12). This matter was previously before the Court on direct appeal, where we vacated a jury verdict convicting defendant of the crimes of murder in the second degree and assault in the first degree due to several significant trial errors, including the trial court's denial of defendant's request for a justification charge.[FN1] From our perspective, it is important for purposes of this resentencing matter to recognize how we recounted the underlying facts in the prior appeal, as follows:
"On [a] morning [in] November . . . 2013, defendant called 911 and reported that 'she had been attacked and needed [police] assistance.' When . . . law enforcement . . . arrived at defendant's apartment, the
. . . body of the victim [, who] defendant had been in an intimate relationship [with,] was discovered covered by a sheet and a blanket on the floor inside the apartment. At the scene and at the police station, defendant gave oral and written statements . . . claim[ing] that the victim had approached her aggressively with a knife and that she reacted in self-defense by hitting him with a . . . baseball bat and, [thereafter], by stabbing him with the knife. An autopsy determined that the victim suffered [extensive injuries]."
Upon remittal, defendant opted to plead guilty to manslaughter in the first degree, resulting in the 15-year term of imprisonment from which she seeks relief under the DVSJA.
Pursuant to Penal Law § 60.12, a court may impose an alternative sentence under the DVSJA when a defendant has established by a preponderance of the evidence following a hearing that "(a) at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the defendant as such term is defined in [CPL 530.11 (1)]; (b) such abuse was a significant contributing factor to the defendant's criminal behavior; [and] (c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, that a sentence of imprisonment pursuant to [Penal Law §§ 70.00, 70.02, 70.06 or 70.71 (2) or (3)] would be unduly harsh" (Penal Law § 60.12 [1]; see CPL 440.47[*7]). At such a hearing, "the court shall consider oral and written arguments, take testimony from witnesses offered by either party, and consider relevant evidence to assist in making its determination" (Penal Law § 60.12 [1]). "Reliable hearsay shall be admissible at such hearings" (Penal Law § 60.12 [1]; CPL 440.47 [2] [e]). "The court may consider any fact or circumstances relevant to the imposition of a new sentence which are submitted by the applicant or the district attorney," including "the institutional record of confinement of such person" (CPL 440.47 [2] [e]). "The court's consideration of the institutional record of confinement of such applicant shall include, but not be limited to, such applicant's participation in or willingness to participate in programming such as domestic violence, parenting and substance abuse treatment while incarcerated and such applicant's disciplinary history" (CPL 440.47 [2] [e]).
In People v Brenda WW. (222 AD3d 1188 [3d Dept 2023]), we recently observed that "the statutory scheme resulting from the DVSJA entails that a reviewing court . . . engage in a review of the sentence imposed without deference to the sentence or resentence under review" (id. at 1193 n 2). Although a trial court's credibility determinations should not be lightly cast aside, we need not defer to County Court's determination in this context particularly where, as here, it is not supported by the record (see id. at 1191; People v Addimando, 197 AD3d 106, 116-117 [2d Dept 2021]). The record demonstrates that from the moment of her 911 call requesting help, through her testimony at the September 22, 2022 resentencing hearing, defendant has been consistent in her claim that she acted in self-defense after the victim entered her residence with a knife and attacked her. Defendant has also been steadfast in her claim that she endured months of physical, emotional and sexual abuse perpetrated by the victim prior to the underlying crime. Nevertheless, County Court, in addressing the first prong of the analysis under the DVSJA, concluded that defendant failed to establish that she was a domestic violence victim, finding her testimony to be "incredible" and "self-serving." Contrary to County Court's determinations, it is our view that defendant presented compelling evidence in this regard, both in the form of her hearing testimony and through corroborative evidence from independent sources. We do not share the majority's observation that "our independent review . . . supports many of County Court's characterizations of [defendant's] testimony" (majority op at 2). To the contrary, we find County Court's critique unfair and unwarranted. Defendant did, at times, endeavor to explain the context in responding to specific questions, but her doing so is not fairly described as evasive and certainly did not warrant the trial court's dismissive criticism.
During the hearing, defendant explained that she and the victim had been in a relationship for a little [*8]over a year at the time of the subject incident. Around seven months into their relationship, the victim — who was 65 years old while defendant was 28 — became verbally, sexually and physically abusive. Defendant, who was financially dependent on the victim, detailed "almost daily" acts of violence perpetrated against her during their relationship, including threats to her life and instances in which the victim "slam[med] his fist into the side of [her]head," "s[u]nk his nails into [her]," punched her, slapped her and scratched her. Defendant also testified that the victim bragged about having previously killed someone, sexually assaulted her while she was bound with a rope and drugged her with hallucinogens. In other statements contained in the record, defendant recounted the victim telling her: "I own you" and "If you leave, I'll kill you." He also attempted to control her weight and isolated her from friends and family, taking away her vehicle and phone and leaving her alone for "days on end" at the camp where they resided. She further explained that October 2013 — the month before the incident — was the worst month she had ever experienced in her entire relationship. As for defendant's assertion that the victim isolated her, defendant's mother confirmed that, for almost a year before the subject incident, there had been "no communication between [defendant] and her."
Defendant also presented independent corroborative evidence in this regard, including an excerpt from the transcript of the underlying jury trial wherein the victim's former employee confirmed that he had observed defendant with a black eye and scratches on her neck during the summer of 2013. That employee also witnessed the victim display classic hallmarks of abusive behavior, recounting an instance in which the victim became very angry with him when he made defendant laugh. Defendant's former paramour also confirmed that he had witnessed defendant "with many marks on her" body during her relationship with the victim and recalled an instance when he arrived at her residence and found her "pinned to the ground" by the victim. This witness revealed that the victim, who was a heavy drinker, was also violent toward him, recounting a circumstance where the victim tried to attack him with a bottle of liquor. He further corroborated defendant's claim that the victim would brag about killing people. As for the nature of his relationship with defendant, the paramour stated she hit him "about three times during separate incidences." He specifically recalled one situation when defendant returned home after an argument, only to find his former girlfriend present. Another argument ensued and when the paramour stated that he "deserved to be hit," defendant punched him in the "left temple," injuring his eye. This witness also recounted circumstances in which defendant was forced to defend herself in altercations with the victim, where he observed her with fresh scratches and blood on her face. [*9]Defendant's mother also recalled seeing her with marks on her face during her relationship with the victim, recounting a circumstance in which she encouraged defendant to go to the hospital because she looked "physically horrible and seemed unstable" but the victim told her "not to go."
If this evidence was not compelling enough, the record also contains a statement from the victim's own brother confirming that he was a violent person.[FN2] The brother explained that, during their childhood, the victim "would provoke him to the point that he needed to retaliate" and was "very aggressive when intoxicated." Like the victim's employee, his brother also recalled the victim displaying classic abusive behavior, noting that the victim "did not want [defendant] around him alone, as a result of totally unfounded jealousy." The brother revealed that, in August 2013, defendant informed him that the victim was "raping her, tearing her clothes, and choking her." In response, the brother suggested that defendant move.
Consistent with the foregoing, defendant also submitted a forensic report authored by Norman J. Lesswing, a psychologist who evaluated her on three different occasions during September 2014, just 10 months after the underlying event.[FN3] In his report, Lesswing concluded that defendant "was a victim of domestic violence within her relationship with" the victim and a "battered woman." Lesswing provided specific examples supporting "classic hallmarks of domestic violence and battering," including the victim's control and power over defendant as evidenced by his desire to keep her isolated, statements like "I own you" and "you'll never get away from me," his "sadomasochistic treatment of [defendant]" — which graduated into bondage leaving "her tied up for extended periods of time" — and "coercive vaginal and anal intercourse." Lesswing also highlighted the victim's "extreme jealousy," repeated threats to kill defendant, several occasions where he drugged defendant "without her knowledge," and defendant's financial dependency on him, explaining that defendant felt "like a prisoner." Notwithstanding this detailed analysis, County Court found Lesswing's findings "to be of little value," stating that he had relied "almost exclusively upon [d]efendant as the source material for [his] evaluation." This is an incorrect characterization of the report, as Lesswing's report cited several different sources for his conclusions, including interviews with the victim's brother and defendant's former paramour. Lesswing also administered psychological testing and based his clinical assessment on approximately 20 hours of observation and interview over the course of three days. In our view, there was no reasonable basis for County Court to discount Lesswing's report and the foregoing independent proof, which amply corroborated defendant's testimony that she had been subjected to months of "substantial abuse by the [victim] and that this abuse had been ongoing up to and including [*10]the underlying incident" (People v Liz L., 221 AD3d 1288, 1291 [3d Dept 2023]; see Penal Law § 60.12 [1] [a]; People v Addimando, 197 AD3d at 118).
County Court also erred in concluding that this abuse was not a significant contributing factor to defendant's criminal conduct. During the hearing, defendant testified about the events precipitating the underlying incident, revealing that, a few days prior, the victim had visited her at the camp where she was residing and "smashed [her] in the side of the head with a piece of firewood." She explained that, at that time, she and the victim were in a "chaotic state of drinking," describing their relationship as "like war." Defendant thereafter left the camp and hitch-hiked into town, where she stayed at an apartment they maintained. She testified that, a few days later, the victim "burst into the house with a knife in his hand" and "came at [her] with [the] kitchen knife screaming he was going to kill [her], like a madman on alcohol and other drugs." Defendant testified that she "absolutely thought he was going to kill [her] because . . . of our behavior for the past year and a half." Hoping to dislodge the knife from the victim's hand, defendant grabbed a baseball bat and "str[u]ck[ ]" his arm and hand, causing him to drop the knife. She recovered the knife and thereafter repeatedly stabbed him in the chest and eye.
We are mindful that defendant's initial statements to police relayed a more brutal account of the events, including that she sat at her computer desk for some time before straightening the bent blade of the knife and stabbing the victim in the right eye when he was already on the ground severely wounded and incapacitated. There was also evidence that defendant waited to call police. Even so, defendant has been consistent in her claim that she was acting to protect herself during an altercation in which the victim was threatening her with a knife — a claim that was generally corroborated by the male DNA found on the knife's handle, the physical evidence of a struggle in the apartment and pictures taken by police after the incident, which show defendant with a scratch next to her right eye and bruises on her body. The inconsistences regarding the specific details are readily explained by defendant's consistent assertion, made as early as her 911 call over 11 years ago, that she was in a state of "shock" and had a stress-induced "blackout" — a claim that is hardly surprising given the traumatic nature of the encounter (see generally 1 NY Law of Domestic Violence § 3:21 [4th ed]). Tellingly, defendant's initial police statement was replete with qualifiers that she "th[ought]" certain of the details she was giving were correct but cautioned that she was not certain. In his forensic report, Lesswing confirmed that defendant's "lack of clarity and reliability in reporting exactly what took place" stemmed from, among other things, the "impact of trauma" upon memory, "wherein recall is partial, hazy[*11], and incomplete" (see generally Mary Ann Dutton, Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome, 21 Hofstra L Rev 1191, 1221 [1993] [detailing evidence that "memory problems such as amnesia and dissociation" can arise from psychological distress resulting from physical and sexual violence]). Considered in context, the majority's observation "that defendant has provided ever-changing stories throughout this case" (majority op at 2) does not comport with the record (compare People v Brenda WW., 222 AD3d at 1198-1199 [Pritzker, J., dissenting]). Under all the circumstances, we find that defendant established, by a preponderance of the evidence, that the abuse she endured was a significant contributing factor to her criminal conduct (see People v Brenda WW., 222 AD3d at 1193; People v Liz L., 221 AD3d at 1291; Penal Law § 60.12 [1] [b]).
Having found that defendant failed to meet her burden on the first two prongs of the analysis, County Court never rendered a finding on the third factor — namely, whether a standard sentence would be "unduly harsh" under the circumstances presented. This factor requires a consideration of "the nature and circumstances of the crime," as well as "the history, character and condition of the defendant" (Penal Law § 60.12 [1] [c]). First and foremost, unlike the encounter in People v Brenda WW. where the victim was neither the aggressor nor armed with a deadly weapon (222 AD3d at 1196-1197 [Pritzker, J., dissenting]), by defendant's account, the victim entered the apartment threatening to kill her with a knife. The brutality of defendant's conduct is certainly relevant to the analysis; however, it is one of several factors to consider and does not disqualify her from obtaining compassionate resentencing under the DVSJA (see Penal Law § 60.12 [1]). After accounting for the totality of the relevant circumstances, we conclude that the brutality of the crime does not outweigh the other factors supporting a reduction in the sentence (see People v Brenda WW., 222 AD3d at 1195; People v Addimando, 197 AD3d at 118). Although the record does contain evidence that defendant previously engaged in a few instances of violent and aggressive behavior even outside of her relationship with the victim, "a close inspection of that history [indicates] that [this behavior] w[as] attributable to her longstanding struggle with substance abuse" (People v Brenda WW., 222 AD3d at 1194).[FN4] Significant to this point, defendant has engaged in various educational and therapeutic programming during her incarceration, including in the areas of alcohol abuse and domestic violence. Aside from one, nonviolent, alcohol-related conviction for driving while ability impaired (a noncriminal traffic infraction), defendant has no prior criminal record, further indicating that her conduct toward the victim stemmed from the abuse she endured at his hands rather than any inherently violent disposition. Similarly, although [*12]defendant received a series of disciplinary tickets while in local jail pending trial more than a decade ago, which the majority cites in detail, her disciplinary record from Bedford Hills Correctional Facility, where she had been incarcerated for approximately eight years by the time of the hearing, is stellar.[FN5] She has family support and intends to move in with her parents if released, hoping to go back to college — where she only needs a few credits to obtain a degree. Defendant showed remorse for her actions during the sentencing hearing on her plea to the manslaughter charge and apologized to the victim's family. She was "tearful" during her interview with Lesswing and also expressed concern for the victim's family in a 2018 probation report. Her friends and family, as well as the victim's own brother, universally described her as a caring person. In these circumstances, we find that a standard sentence is "unduly harsh" and that defendant's application for compassionate resentencing under the DVSJA should be granted. In closing, we note that defendant has already served 11 years of her sentence, "which is above the maximum allowed under the DVSJA for a class B felony
. . . for manslaughter in the first degree" (People v Liz L., 221 AD3d at 1292; see Penal Law §§ 60.12 [2] [a]; 70.45 [2] [f]). Absent relief here, defendant will be eligible for parole in only two years and her maximum expiration date is set for November 2028. Based on all the foregoing, continuing defendant's incarceration runs counter to the objective and spirit of the DVSJA, which seeks to ameliorate the "unjust ways in which the criminal justice system responds to and punishes domestic violence survivors who act to protect themselves from an abuser's violence" (Assembly Mem in Support, Bill Jacket, L 2019, ch 31 at 6). A resentencing under CPL 440.47 is warranted.
Fisher, J., concurs.
ORDERED that the order is affirmed.

Footnotes

Footnote 1: In an effort to maintain defendant's anonymity as a domestic violence survivor, we are not utilizing her surname in this decision or providing the citation to our prior determination.

Footnote 2: This statement is contained in a forensic report authored by a psychologist who engaged in a clinical assessment of defendant.

Footnote 3: The report was stipulated into evidence at the resentencing hearing.

Footnote 4: The majority notes that the record contains a letter that defendant wrote to the victim during their relationship in which she asked him not to fear her and said that she never hit him on a sober day. Tellingly, in the same letter, defendant expressed the following: "I [know] you['re] a very smart man. I don't show you the appr[ecia]tion you deserve . . . . I need to show [you] more respect . . . . I do respect you. I just need to show it [and] shut my mouth." These are classic statements of abuse victims, who often internalize the abuse they endure (see generally 1 NY Law of Domestic Violence § 3:21 [4th ed]). We further note that a mutually-abusive relationship — if that is what occurred here — "does not foreclose a determination that defendant was a victim of abuse" or disqualify her from obtaining sentencing reduction under the DVSJA (People v Brenda WW., 222 AD3d at 1191).

Footnote 5: During the hearing, defendant revealed that she had received a tier II disciplinary ticket a month prior for making a duffle bag out of a Vietnam War jacket. This ticket was dropped by the sergeant.